AO93 Search and Seizure Warrant

# UNITED STATES DISTRICT COURT
for the
District of Arizona

| | |
|---|---|
| In the Matter of the Search of<br>Apple iPhone, serial number G0NFH0190D47. | Case No.   21-9162 MB |

### SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the District of Arizona:

### As further described in Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal:

### As set forth in Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before _____8/9/2021_____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m. ☒ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to <u>any United States Magistrate Judge on criminal duty in the District of Arizona</u>.

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized ☐ for __30__ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:  _____7/26/2021@10:18am_____       *E.S.Willett*
                                                                                          *Judge's signature*

City and state: <u>Phoenix, Arizona</u>                  <u>Honorable EILEEN S. WILLETT, U.S. Magistrate Judge</u>
                                                                              *Printed name and title*

## ATTACHMENT A

*Property to be searched*

The property to be searched is an Apple iPhone, serial number G0NFH0190D47, seized from Michael Tae Jacoby (hereafter the "SUBJECT CELLULAR TELEPHONE") The SUBJECT CELLULAR TELEPHONE is currently located in the FBI Evidence Control Room at 21711 N. 7th St., Phoenix, AZ 85024.

This warrant authorizes the forensic examination of the SUBJECT CELLULAR TELEPHONE for the purpose of identifying the electronically stored information described in Attachment B.

**ATTACHMENT B**

*Property to be seized*

1.     Any records and information found within the digital contents of the SUBJECT CELLULAR TELEPHONE that relate to violations of 18 U.S.C. § 1343 (Wire Fraud) and 18 U.S.C. § 1957 (Money Laundering), from January 1, 2019, through present, including:

     a.  all information and records related to cryptocurrency investments or the provision of investment management services;

     b.  all bank records, checks, credit card bills, account information, or other financial records;

     c.  all information and records regarding the receipt, transfer, possession, or use of proceeds from the offenses under investigation;

     d.  any information recording schedule or travel;

     e.  evidence indicating the cellular telephone user's state of mind as it relates to the offenses under investigation;

     f.  contextual information necessary to understand the above evidence.

2.     Any records and information found within the digital contents of the SUBJECT CELLULAR TELEPHONE showing who used or owned the device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history; and

3.     Any and all cryptocurrency, to include the following:

     a.  any and all representations of cryptocurrency public keys or addresses;

     b.  any and all representations of cryptocurrency private keys;

    c. any and all representations of cryptocurrency wallets or their constitutive parts, whether in electronic or physical format, to include "recovery seeds" or "root keys" which may be used to regenerate a wallet.

The United States is authorized to seize any and all cryptocurrency by transferring the full account balance in each wallet to a public cryptocurrency address controlled by the United States.

As used above, the terms "records" and "information" includes records of telephone calls; names, telephone numbers, usernames, or other identifiers saved in address books, contacts lists and other directories; text messages and other stored communications; subscriber and device information; voicemails or other audio recordings; videos; photographs; e-mails; internet browsing history; calendars; to-do lists; contact information; mapping and GPS information; data from "apps," including stored communications; reminders, alerts and notes; and any other information in the stored memory or accessed by the electronic features of the cellular telephone.

This warrant authorizes a review of records and information seized, copied or disclosed pursuant to this warrant in order to locate evidence and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized, copied, or disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

AO 106 Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
District of Arizona

| In the Matter of the Search of<br>Apple iPhone, serial number G0NFH0190D47. | Case No.   21-9162 MB |
|---|---|

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

**As further described in Attachment A**

located in the District of Arizona, there is now concealed:

**As set forth in Attachment B.**

The basis for the search under Fed. R. Crim. P. 41(c) is:
☒ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☒ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code/Section | Offense Description |
|---|---|
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 1957 | Money Laundering |

The application is based on these facts:

**See attached Affidavit of Special Agent Troy Cofer**

☒ Continued on the attached sheet.
☐ Delayed notice of _30_ days (give exact ending date if more than 30 days: _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by AUSA Caitlin Noel *CBN*

_____
*Applicant's Signature*

Special Agent TROY COFER, FBI
*Printed name and title*

Sworn to before me telephonically.

Date: _7/26/2021 @ 10:18am_

_____
*Judge's signature*

City and state: _Phoenix, Arizona_

Honorable EILEEN S. WILLETT, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A

*Property to be searched*

The property to be searched is an Apple iPhone, serial number G0NFH0190D47, seized from Michael Tae Jacoby (hereafter the "SUBJECT CELLULAR TELEPHONE") The SUBJECT CELLULAR TELEPHONE is currently located in the FBI Evidence Control Room at 21711 N. 7th St., Phoenix, AZ 85024.

This warrant authorizes the forensic examination of the SUBJECT CELLULAR TELEPHONE for the purpose of identifying the electronically stored information described in Attachment B.

**ATTACHMENT B**

*Property to be seized*

1.      Any records and information found within the digital contents of the SUBJECT CELLULAR TELEPHONE that relate to violations of 18 U.S.C. § 1343 (Wire Fraud) and 18 U.S.C. § 1957 (Money Laundering), from January 1, 2019, through present, including:

  a.  all information and records related to cryptocurrency investments or the provision of investment management services;

  b.  all bank records, checks, credit card bills, account information, or other financial records;

  c.  all information and records regarding the receipt, transfer, possession, or use of proceeds from the offenses under investigation;

  d.  any information recording schedule or travel;

  e.  evidence indicating the cellular telephone user's state of mind as it relates to the offenses under investigation;

  f.  contextual information necessary to understand the above evidence.

2.      Any records and information found within the digital contents of the SUBJECT CELLULAR TELEPHONE showing who used or owned the device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history; and

3.      Any and all cryptocurrency, to include the following:

  a.  any and all representations of cryptocurrency public keys or addresses;

  b.  any and all representations of cryptocurrency private keys;

    c.  any and all representations of cryptocurrency wallets or their constitutive parts, whether in electronic or physical format, to include "recovery seeds" or "root keys" which may be used to regenerate a wallet.

The United States is authorized to seize any and all cryptocurrency by transferring the full account balance in each wallet to a public cryptocurrency address controlled by the United States.

As used above, the terms "records" and "information" includes records of telephone calls; names, telephone numbers, usernames, or other identifiers saved in address books, contacts lists and other directories; text messages and other stored communications; subscriber and device information; voicemails or other audio recordings; videos; photographs; e-mails; internet browsing history; calendars; to-do lists; contact information; mapping and GPS information; data from "apps," including stored communications; reminders, alerts and notes; and any other information in the stored memory or accessed by the electronic features of the cellular telephone.

This warrant authorizes a review of records and information seized, copied or disclosed pursuant to this warrant in order to locate evidence and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized, copied, or disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

Your Affiant, Troy Cofer, being first duly sworn, hereby deposes and states as follows:

### I.   INTRODUCTION AND AGENT BACKGROUND

1.      Your Affiant makes this Affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to examine the cellular telephone further described in Attachment A (hereafter "SUBJECT CELLULAR TELEPHONE"), and in order to extract the electronically stored information set forth in Attachment B, which represent evidence and/or instrumentalities of the criminal violations further described below.

2.      I am a Special Agent with the Federal Bureau of Investigation (FBI), Phoenix Division, and have been since September 2019. I am a law enforcement officer with authority to execute arrest, search, and seizure warrants under the authority of 18 U.S.C. § 3052. I have a bachelor's degree in Operations Management and a master's degree in Finance. Before joining the FBI, I worked as a Finance Manager at a manufacturing company. I was trained at the FBI Academy in Quantico, Virginia, and I am currently assigned to the Phoenix Division's Complex Financial Crimes Squad, specializing in corporate fraud and other complex financial crimes.

3.      The facts supporting this Affidavit are based on my personal knowledge and information received from other law enforcement personnel assisting in this investigation, through financial information, interviews, other documents, and sources. I have reviewed and am familiar with the information contained in this Affidavit and allege the facts contained herein to be accurate.

4.      Because this Affidavit is being submitted for the limited purpose of establishing probable cause for this search warrant, I have not included each and every fact known to me concerning this investigation.

## II.    BASIS FOR PROBABLE CAUSE

5.    In November 2020, Phoenix FBI office received information from the FBI National Threat Operations Center (NTOC) regarding fraudulent activity by Michael Tae Jacoby. The information NTOC received described a scheme where Jacoby pitched an opportunity for personal protective equipment (PPE) in the early days of the COVID-19 pandemic. Jacoby informed individuals he had a buyer and seller for PPE but needed to fund the deal by purchasing PPE inventory. Jacoby requested individuals provide him money to purchase the inventory.  In return, individuals were to receive their original money back plus a specified return. Individuals that sent Jacoby money received several excuses about the deal falling apart and Jacoby would not return the money.

6.    A search of FBI databases revealed that other individuals previously notified the FBI of separate schemes perpetrated by Jacoby in the past, including a scheme to defraud victim W.H.

7.    Investigation revealed that in late 2018, Jacoby was introduced to W.H. through a mutual friend. W.H., a retired widower, resided in Flagstaff. According to W.H., Jacoby claimed to have made millions of dollars flipping houses in the Phoenix area and investing in bitcoin, a cryptocurrency.

8.    In or around July 2019, at Jacoby's request, W.H. agreed to have Jacoby manage approximately $1,000,000 of his retirement money pursuant to an investment management agreement. The agreement provided that Jacoby would be compensated only if returns exceeded six percent. The agreement also required monthly distributions to W.H. to pay for living expenses.

9.    On July 19, 2019, at Jacoby's direction, W.H. opened a bank account (ending -2169) at Wells Fargo Bank and added Jacoby as a signatory. W.H. transferred approximately $215,000 from his retirement account to the joint Wells Fargo account. According to W.H., Jacoby told W.H. that he would use the money in the joint account to

purchase bitcoin from a contact in Seattle, Washington.  Instead, bank records reflect that on July 25, 2019, Jacoby withdrew $15,000 in cash from the joint Wells Fargo account. That same day, Jacoby transferred $200,000 from the joint Wells Fargo account to a business checking account (ending -0857) at Wells Fargo in the name of Social Capital LLC, on which Jacoby was the only signatory. Between July 25, 2019, and August 13, 2019, Jacoby made seven cash withdrawals totaling $165,000 from the Social Capital LLC checking account. He also made purchases from airlines, hotels, and the Apple store. Contrary to his representation to W.H., bank records reflect that Jacoby did not use W.H.'s $215,000 to purchase bitcoin for retirement investment purposes.

10.    In addition to the joint Wells Fargo account, at Jacoby's direction W.H. also opened an account (ending -9109) at Gemini Trust Company LLC, a bitcoin exchange and custodian. On July 26, 2019, W.H. wired $800,000 from a personal Wells Fargo account (ending -4176) to the Gemini account. Jacoby used the funds transferred by W.H. to purchase bitcoin in the Gemini account. After purchasing bitcoin with W.H.'s retirement money, Jacoby transferred the bitcoin out of the Gemini account to other bitcoin addresses. According to W.H., he never authorized Jacoby to move bitcoin out of the Gemini account. By August 22, 2019, W.H.'s Gemini account had a balance of zero.

11.    In or around July 2020, Jacoby falsely advised W.H. that his investment accounts had increased in value to $1,200,000. Then in or around December 2020, Jacoby ceased all communication with W.H. and stopped making monthly disbursement payments. W.H. unsuccessfully asked Jacoby to return his money. At that point, W.H. discovered that his Gemini account had a zero balance.

12.    On June 15, 2021, a federal grand jury indicted Jacoby on seven counts of Wire Fraud and eight counts of Money Laundering in Case No. CR-21-00452-PHX-JJT, based on his conduct in relation to W.H. The court issued a warrant for Jacoby's arrest.

3

13.     On June 22, 2021, Jacoby was arrested in Scottsdale, Arizona, by the FBI. The SUBJECT CELLULAR TELEPHONE was in Jacoby's possession at the time of his arrest and was seized by FBI incident to arrest.

14.     The day after Jacoby's arrest, on June 23, 2021, FBI interviewed P.N., who advised that he met Jacoby in Arizona in November 2020 through a mutual friend. According to P.N., Jacoby introduced himself as a financial advisor and investment manager who did work with cryptocurrency.

15.     According to P.N., in approximately December 2020, he entered into an investment management agreement with Jacoby wherein Jacoby agreed to invest in cryptocurrency for P.N. Money provided to Jacoby by P.N. was only to be used for investment purposes, not personal expenses.

16.     According to bank records, between February 2021 through June 2021, P.N. wired approximately $900,750 to Jacoby's Chase bank account ending -8959. P.N. advised that the purpose of these transfers was for Jacoby to invest in cryptocurrency on his behalf.

17.     Bank records reflect that, rather than invest P.N.'s money, Jacoby spent it on personal expenses, including, among other transactions: cash withdrawals (approximately $131,000); spending on retail, travel, meals, and entertainment purchases (approximately $91,000); and rent payments (approximately $137,000). Jacoby also transferred approximately $147,000 to his account at Coinbase, a cryptocurrency exchange platform, the Coinbase account was owned by Jacoby.

18.     Based on the foregoing, Jacoby is believed to have defrauded P.N. in the same manner in which he defrauded W.H.

19.     According to P.N., Jacoby conducted transactions from his bank account to a Coinbase account via his cell phone. Also according to P.N., Jacoby claimed to own cryptocurrency valued at over $425 million at some point in 2021. Jacoby used CoinStats,

4

a cryptocurrency portfolio tracking app on his cell phone, to show P.N. Jacoby's alleged holdings. P.N. provided FBI with screenshots of the app.

20.     Based on my training, research, education, and experience, I am familiar with the following background information about cryptocurrency:

a.   Cryptocurrency, a type of virtual currency, is a decentralized, peer-to peer, network-based medium of value or exchange that may be used as a substitute for fiat currency to buy goods or services or exchanged for fiat currency or other cryptocurrencies.  Examples of cryptocurrency are Bitcoin, Litecoin, and Ether.  Cryptocurrency can exist digitally on the Internet, in an electronic storage device, or in cloud-based servers.  Although not usually stored in any physical form, public and private keys (described below) used to transfer cryptocurrency from one person or place to another can be printed or written on a piece of paper or other tangible object.  Cryptocurrency can be exchanged directly person to person, through a cryptocurrency exchange, or through other intermediaries.  Generally, cryptocurrency is not issued by any government, bank, or company; it is instead generated and controlled through computer software operating on a decentralized peer-to-peer network.  Most cryptocurrencies have a "blockchain," which is a distributed public ledger, run by the decentralized network, containing an immutable and historical record of every transaction. Cryptocurrency is not illegal in the United States.

b.   Cryptocurrency is stored in a virtual account called a wallet. Wallets are software programs that interface with blockchains and generate and/or store public and private keys used to send and receive cryptocurrency. A public key or address is akin to a bank account number, and a private key is akin to a PIN number or password that allows a user the ability to access and transfer value associated with the public address or key. To conduct transactions on

5

a blockchain, an individual must use the public address (or "public key") and the private address (or "private key"). A public address is represented as a case-sensitive string of letters and numbers, 26–25 characters long. Each public address is controlled and/or accessed through the use of a unique corresponding private key—the cryptographic equivalent of a password or PIN—needed to access the address. Only the holder of an address' private key can authorize any transfers of cryptocurrency from that address to another cryptocurrency address.

c. Although cryptocurrencies such as bitcoin have legitimate uses, cryptocurrency is also used by individuals and organizations for criminal purposes such as money laundering, and is an oft-used means of payment for illegal goods and services on hidden services websites operating on the Tor network. By maintaining multiple wallets, those who use cryptocurrency for illicit purposes can attempt to thwart law enforcement's efforts to track purchases within the dark web marketplaces. As of July 1, 2021, at 5:14pm MST, one bitcoin is worth approximately $33,920.53, and one ether is worth approximately $2,129.69, though the value of bitcoin and ether are generally much more volatile than that of fiat currencies. Fiat money is government-issued currency that is not back by a commodity such as gold. Most modern paper currencies, such as the U.S. dollar, are fiat currency. Ethereum is a blockchain-based software platform that can be used for sending or receiving value globally via its native cryptocurrency, ether, without any third party interference.

d. Exchangers and users of cryptocurrencies store and transact their cryptocurrency in a number of ways, as wallet software can be housed in a variety of forms, including on a tangible, external device ("hardware

6

wallet"), downloaded on a PC or laptop ("desktop wallet"), with an Internet-based cloud storage provider ("online wallet"), as a mobile application on a smartphone or tablet ("mobile wallet"), printed public and private keys ("paper wallet"), and as an online account associated with a cryptocurrency exchange.  Because these desktop, mobile, and online wallets are electronic in nature, they are located on mobile devices (e.g., smart phones or tablets) or at websites that users can access via a computer, smart phone, or any device that can search the Internet.  Moreover, hardware wallets are located on some type of external or removable media device, such as a USB thumb drive or other commercially available device designed to store cryptocurrency (e.g. Trezor, Keepkey, or Nano Ledger).  In addition, paper wallets contain an address and a QR code with the public and private key embedded in the code.   Paper wallet keys are not stored digitally.  Wallets can also be backed up into, for example, paper printouts, USB drives, or CDs, and accessed through a "recovery seed" (random words strung together in a phrase) or a complex password.   Additional security safeguards for cryptocurrency wallets can include two-factor authorization (such as a password and a phrase).   I also know that individuals possessing cryptocurrencies often have safeguards in place to ensure that their cryptocurrencies become further secured in the event that their assets become potentially vulnerable to seizure and/or unauthorized transfer.

e.  Some companies offer cryptocurrency wallet services which allow users to download a digital wallet application onto their smart phone or other digital device. A user typically accesses the wallet application by inputting a user-generated PIN code or password. Users can store, receive, and transfer cryptocurrencies via the application; however, many of these companies do

7

not store or otherwise have access to their users' funds or the private keys that are necessary to access users' wallet applications. Rather, the private keys are stored on the device on which the wallet application is installed (or any digital or physical backup private key that the user creates). As a result, these companies generally cannot assist in seizing or otherwise restraining their users' cryptocurrency. Nevertheless, law enforcement could seize cryptocurrency from the user's wallet directly, such as by accessing the user's smart phone, accessing the wallet application, and transferring the cryptocurrency therein to a law enforcement-controlled wallet. Alternatively, where law enforcement has obtained the recovery seed for a wallet (see above), law enforcement may be able to use the recovery seed phrase to recover or reconstitute the wallet on a different digital device and subsequently transfer cryptocurrencies held within the new wallet to a law enforcement-controlled wallet.

21.     Based on the foregoing, the SUBJECT CELLULAR TELEPHONE likely contains evidence and instrumentalities of criminal activity, specifically, violations of 18 U.S.C. § 1343 (Wire Fraud) and 18 U.S.C. § 1957 (Money Laundering).

22.     The SUBJECT CELLULAR TELEPHONE is currently in storage at the Evidence Control Room at 21711 N. 7th St., Phoenix, AZ 85024.  In my training and experience, I know that the SUBJECT CELLULAR TELEPHONE has been stored in a manner in which the contents are, to the extent material to this investigation, in substantially the same state as they were when the SUBJECT CELLULAR TELEPHONE first came into the possession of the FBI.

### III.    ITEMS TO BE SEIZED

23.    Based upon the facts contained in this Affidavit, your Affiant submits there is probable cause to believe that the items listed in Attachment B will be found in the contents of the SUBJECT CELLULAR TELEPHONE.

24.    In addition to items which may constitute evidence and/or instrumentalities of the crimes set forth in this Affidavit, your Affiant also requests permission to seize any articles tending to establish the identity of persons who have dominion and control over the SUBJECT CELLULAR TELEPHONE.

### IV.    DIGITAL EVIDENCE STORED WITHIN A CELLULAR TELEPHONE

25.    As described in Attachment B, this application seeks permission to search for records and information that might be found in the contents of the SUBJECT CELLULAR TELEPHONE.  Thus, the warrant applied for would authorize the copying of electronically stored information under Rule 41(e)(2)(B).

26.    *Probable cause.*  Your Affiant submits that there is probable cause to believe records and information relevant to the criminal violations set forth in this Affidavit will be stored on the SUBJECT CELLULAR TELEPHONE for at least the following reasons:

a.    Your Affiant knows that when an individual uses a cellular telephone, the cellular telephone may serve both as an instrumentality for committing the crime and also as a storage medium for evidence of the crime.   The cellular telephone is an instrumentality of the crime because it is used as a means of committing the criminal offense. The cellular telephone is also likely to be a storage medium for evidence of crime. From my training and experience, your Affiant believes that a cellular telephone used to commit a crime of this type may contain: data that is evidence of how the cellular telephone was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

b.      Based on my knowledge, training, and experience, your Affiant knows that cellular telephones contain electronically stored data, including, but not limited to, records related to communications made to or from the cellular telephone, such as the associated telephone numbers or account identifiers, the dates and times of the communications, and the content of stored text messages, e-mails, and other communications; names and telephone numbers stored in electronic "address books;" photographs, videos, and audio files; stored dates, appointments, and other information on personal calendars; notes, documents, or text files; information that has been accessed and downloaded from the Internet; and global positioning system ("GPS") information.

c.      Based on my knowledge, training, and experience, your Affiant knows that electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a cellular telephone, deleted, or viewed via the Internet. Electronic files downloaded to a cellular telephone can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a cellular telephone, the data contained in the file does not actually disappear; rather, that data remains on the cellular telephone until it is overwritten by new data.

d.      Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the cellular telephone that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a cellular telephone's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

27.    *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronic files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how the cellular telephone was used, the purpose of the use, who used it, and

10

when. There is probable cause to believe that this forensic electronic evidence will be found in the contents of the SUBJECT CELLULAR TELEPHONE because:

       a.     Data in a cellular telephone can provide evidence of a file that was once in the contents of the cellular telephone but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

       b.     As explained herein, information stored within a cellular telephone may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within electronic storage medium (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the cellular telephone. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the cellular telephone was remotely accessed, thus inculpating or exculpating the owner. Further, activity on a cellular telephone can indicate how and when the cellular telephone was accessed or used. For example, as described herein, cellular telephones can contain information that log: session times and durations, activity associated with user accounts, electronic storage media that connected with the cellular telephone, and the IP addresses through which the cellular telephone accessed networks and the internet. Such information allows investigators to understand the chronological context of cellular telephone access, use, and events relating to the crime under investigation. Additionally, some information stored within a cellular telephone may provide crucial evidence relating to the physical location of other evidence

11

and the suspect.  For example, images stored on a cellular telephone may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created. The geographic and timeline information described herein may either inculpate or exculpate the user of the cellular telephone.  Last, information stored within a cellular telephone may provide relevant insight into the user's state of mind as it relates to the offense under investigation.  For example, information within a computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

     c.    A person with appropriate familiarity with how a cellular telephone works can, after examining this forensic evidence in its proper context, draw conclusions about how the cellular telephone was used, the purpose of its use, who used it, and when.

     d.    The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a cellular telephone that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, cellular telephone evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on one cellular telephone is evidence may depend on other information stored on that or other storage media and the application of knowledge about how electronic storage media behave.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

     e.    Further, in finding evidence of how a cellular telephone was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence

12

of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

28.     *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant your Affiant is applying for would permit imaging or otherwise copying the contents of the SUBJECT CELLULAR TELEPHONE, including the use of computer-assisted scans.

29.     *Manner of execution.*  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## V.     CONCLUSION

30.     Your Affiant submits there is probable cause to believe that the items listed in Attachment B, which constitute evidence and/or instrumentalities of violations of 18 U.S.C. § 1343 (Wire Fraud) and 18 U.S.C. § 1957 (Money Laundering) are likely to be found in the contents of the SUBJECT CELLULAR TELEPHONE further described in Attachment A.

_____
Special Agent Troy Cofer
Federal Bureau of Investigation

Sworn to before me telephonically this ____26____ day of ____July____, 2021.

_____
HONORABLE EILEEN S. WILLETT
United States Magistrate Judge

13